# HERMAN LEE PETTIFORD AND JOHN OLIVER BERRY *v.* STATE OF MARYLAND

[No. 153, September Term, 1969.]

*Decided January 28, 1970.*

The cause was argued before MURPHY, C.J., and AN-DERSON, MORTON, ORTH, and THOMPSON, JJ.

*Arthur G. Murphy* for appellant Pettiford, and *Irving B. Klitzner* for appellant Berry.

*William E. Brannan, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Charles E. Moylan, Jr., State's Attorney for Baltimore City,* and

*Joseph Harlan, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

THOMPSON, J., delivered the opinion of the Court.

Herman Lee Pettiford appeals from a conviction for keeping a dwelling house for the purpose of selling narcotics. A codefendant, John Oliver Berry, appeals from a conviction of possession of narcotics and of being a second offender under an addendum thereto. They were tried before Judge George D. Solter sitting without a jury in the Criminal Court of Baltimore and sentenced to terms of five and ten years respectively. Questions presented on appeal concern: (1) the sufficiency of the evidence, (2) the legality of the searches, (3) failure of the trial judge to render a verdict as to the addendum and (4) the failure to provide Berry with a continuance for the purpose of obtaining counsel of his own choosing.

In order to properly present the issues it will be necessary to recite the evidence in some detail.

Detective Clyde Vernon Wilhelm of the Narcotics Unit, Baltimore City Police Department, by stipulation of counsel, read into the record his affidavit which he previously executed to secure a search warrant for the premises at 1841 North Register Street. The testimony was presented as to the question of guilt or innocence because the search warrant was not challenged below nor was evidence seized thereunder objected to below. The substance of his testimony follows:

The aforesaid premises were occupied by John Oliver Berry and another known by the alias "Al."

On May 14, 1968, at approximately 9:20 P.M. Detective Wilhelm and Detective Larry Clark met an informant who had previously furnished reliable evidence. This informant, given $5. by the officers, made a purchase at 1841 North Register Street from an individual called "Al" of two (2) gelatin capsules containing white powder, later determined to be methadone-amidone, a synthetic prohibited narcotic drug. The seller was iden-

tified as a colored male, 5'10" to 5'11", 19-21 years of age, wearing a mustache, small goatee and bushy hair and clothing green in color.

Detective Wilhelm met the same informant on May 23, 1968, at about 8:45 P.M. at which time the latter called the telephone number 732-6554 and arranged to make a purchase from "Al" by meeting him at a telephone booth at North Avenue and Register Street. The informant's part of this conversation was heard by two officers. The informant was taken by police vehicle to the intersection of North Avenue and Broadway where he exited the vehicle. At about 9:05 P.M. Detective Wilhelm observed the informant and an unidentified individual make some sort of exchange. The material from this exchange was later identified as two clear gelatin capsules containing a white powder later determined to be methadone-amidone. The unidentified individual, who was seen at the premises 1841 North Register Street prior to the transaction and who returned thereafter, was described as a Negro, 5'10", 19-20 years of age, bushy hair and wearing clothing gold and brown in color.

On May 27, 1968, Detective Wilhelm placed the 1841 North Register Street premises under surveillance from approximately 2:00 P.M. to 4:05 P.M. At approximately 3:10 P.M., he observed the same individual he had seen on May 23, 1968, make a transaction with the informant, leave the premises, go some distance from the house, make an exchange of something with a white man and return to the same house.

At approximately 3:37 P.M. appellant Pettiford, identified in court, was seen entering the premises where he remained for the rest of the surveillance period. At 3:45 P.M. the officer saw a Negro female enter, at about the same time a Negro male, unsteady and staggering, left the premises. At 4:00 P.M. he saw a Negro female enter and at that time ended his detail. The officer testified that while working in an undercover capacity in November of 1966, he had several conversations with Pettiford in reference to narcotic drugs.

On June 13, 1968, the Register Street house was again watched from 7:20 A.M. to 9:45 A.M. At 7:50 A.M. the officer saw a person known to him as appellant, John Oliver Berry, lean out the upstairs window and look up and down the street. Again at 8:05 A.M., the officer saw appellant Berry look up and down the street from the front door. At 8:24 A.M., Berry admitted a white woman to the house who remained approximately one minute and departed in the same cab used for arrival. At 8:55 A.M., Berry left the premises, held a brief conversation with a white man some distance therefrom and returned to the house. At 9:25 A.M. he admitted a Negro male into the house who remained inside for approximately one minute and left; surveillance ended at 9:45 A.M. Berry had made a sale of narcotics to the same officer on November 8, 1966.

On June 18, 1968, at approximately 6:10 A.M., a search warrant for the premises in question was executed by Detective Wilhelm, Detective Sergeant Leon Tomlin, and other police officers. Bruce Rudell Jackson and Virginia Gaylord were occupying a bed in the rear bedroom on the second floor; Dennis A. Jackson was found occupying the middle bedroom on the second floor, and John Oliver Berry was in the front bedroom of that same floor.

The rear bedroom was searched by Detective Sergeant Tomlin and a box containing 272 clear gelatin capsules filled with white powder was found taped underneath the second dresser drawer. The powder was diagnosed to be methadone-amidone, a synthetic prohibited narcotic drug.

Detective Fred Entz recovered from a chair cushion in the front bedroom a brown paper bag containing 32 clear gelatin capsules filled with white powder, later diagnosed to be methadone-amidone, and one manila envelope containing a clear substance, later diagnosed to be marihuana. Appellant Berry was found sleeping in the bed in that room.

On the first floor in the kitchen refrigerator, Detective Wilhelm found one envelope containing 26 red gela-

tin capsules with a white powder inside and one manila envelope containing two red gelatin capsules with a white powder inside, later diagnosed to be cocaine.

The searching officers found on the dresser in the second floor front bedroom a receipt from William E. Koons, Inc., a real estate company, in the name of appellant Herman Lee Pettiford for the premises 1841 North Register Street and between the wall and the dresser of the same bedroom a gas and electric bill in the name of Herman Lee Pettiford for 1841 North Register Street. The rent receipt was for May, 1968 and the gas and electric bill was for the period up to June 10, 1968, payable by June 27, 1968. An arrest warrant was obtained for appellant Pettiford.

On July 9, 1968, at approximately 12:05 P.M., the officers went to the residence of Ida Mae Green, 1432 North Eden Street and placed appellant Pettiford under arrest. He was found in bed in the rear bedroom of the third floor. After the arrest a search was conducted of the third floor bedroom where three empty capsule boxes and a brown box containing numerous glassine bags were found. The opinion of the police officer, based upon his experience as a narcotics officer, was that both the capsules and the glassine bags were of the type commonly used to package narcotic drugs. The arresting officers also recovered two rent receipts for the address 1841 North Register Street dated August 7, 1967 and August 19, 1967 in the name of appellant, Pettiford.

In defense appellant Berry testified that prior to April 24, 1968, he had been incarcerated at Hagerstown, Maryland, and from that date until the time of the raid by police officers had been living alone at 1841 North Register Street except for a few occasions when his friends were allowed to stay there. Berry further testified he was paying the rent but he had asked Pettiford to take care of it for him prior to his release from prison; he had expected an earlier parole. Berry also claimed he paid the telephone, gas and electric bills. He admitted

the narcotics found in the house belonged to him and said none of the other defendants knew about the presence of narcotics on the premises. He also admitted selling drugs for about three years and having been previously convicted of possession of heroin. Appellant Berry stated that he had never sold any narcotics to Pettiford; that Pettiford had never spent the night at 1841 North Register Street; and that he had never gotten any narcotics from Pettiford.

The appellant Pettiford testified he had obtained the premises as a favor for John Berry because Berry could not get credit before his expected parole. When Pettiford discovered he could not rent the premises in the name of Berry, he rented the premises in his own name. He admitted that he had paid the gas, electric, and telephone bills until Berry came home.

### Contentions as to Appellant Pettiford

Pettiford first contends there was insufficient probable cause for the issuance of the search warrant, but since this issue was not presented to the trial court, it is not before us. Maryland Rule 1085. He also contends the warrant for his arrest was based on insufficient probable cause. When an arrest warrant is valid on its face, we are aware of no procedure in this State to attack its issuance for the lack of probable cause. *Williams v. State,* 6 Md. App. 511, 516, 252 A. 2d 262. See also *Duggins v. State,* 7 Md. App. 486, 256 A. 2d 354.

Pettiford next contends the search incident to his arrest at 1432 North Eden Street was unreasonable; therefore, the evidence seized at that time was improperly admitted. Since the trial occurred prior to *Chimel v. California,* 395 U. S. 752, 89 S. Ct. 2034, 23 L.Ed.2d 685 (June 23, 1969) the record was not as fully developed as it would have been otherwise, as to exactly where, in the room, the articles were seized. In *Scott v. State,* 7 Md. App. 505, 256 A. 2d 384, we held that *Chimel* was not retroactive to searches occurring prior to June 23, 1969; thus, the instant case is controlled by cases prior

thereto, some of which we discussed in *Scott*. We think *Harris v. United States*, 331 U. S. 145, 67 S. Ct. 1098, 91 L. Ed. 1399, permitting the search of an entire four room apartment, would clearly authorize the search of the entire room in which the appellant Pettiford was arrested; the search at that time was not unreasonable even though the articles were not shown to be within reach of the accused at the time of the arrest as is now required by *Chimel, supra*.

Finally, appellant Pettiford contends that the evidence was insufficient to support his conviction, citing *Haley v. State*, 7 Md. App. 18, 253 A. 2d 424 and *Wimberly v. State*, 7 Md. App. 302, 254 A. 2d 711. Although *scienter* is required to support a conviction for keeping a house for the purpose of selling and storing narcotics, we cannot say the conviction was clearly erroneous under Maryland Rule 1086. The receipts found in the two searches show that the appellant Pettiford paid the rent and utilities on the property for almost a year. A surveillance of the premises by the officers established that the property was frequently and constantly resorted to for the purchase of narcotics. Appellant Pettiford was actually present for a 23 minute period while the property was under observation by the officers during which time two persons entered the property and a third one left the property staggering. In addition, a search of the place where appellant Pettiford was arrested produced capsule boxes and glassine envelopes of the type generally used by narcotics peddlers. The trial judge noted that some of the capsules found at the scene of Pettiford's arrest were pink and some were white, corresponding to similar capsules found at 1841 North Register Street when the search warrant was served. The trial court specifically stated it did not believe Pettiford's story as to why the utilities and rent were paid in his name.

### Contentions by John Oliver Berry

Berry first contends that the evidence was insufficient to support his conviction. It is difficult to take his con-

tention seriously since he took the witness stand, after being clearly advised of his rights, and admitted that the drugs found at 1841 North Register Street belonged to him.

Berry next contends the trial judge did not enter a verdict as to the addendum. The record shows that at the conclusion of the case the following occurred:

> "MR. HARLAN: Excuse me, Your Honor, this is only as to Pettiford, is it not? I remind the Court of the addendum which the State is ready to prove on Berry.
>
> "THE COURT: Well, perhaps I ought to clear that up first. Is there any contest about that, Mr. Stern?
>
> "MR. STERN: No, Your Honor, in fact, he admitted when he took the stand that he had been convicted.
>
> "MR. HARLAN: Officer Wilhelm was the one that made the arrest in the prior case.
>
> "THE COURT: Make a stipulation then as to the addendum and see if Mr. Stern agrees with it.
>
> "MR. HARLAN: The stipulation by and between the State and defense would be that John Oliver Berry was convicted before His Honor Judge Grady on 6/21/67 of the sale of narcotics to one Officer — Detective Wilhelm, the same Detective Wilhelm who testified in the case and who is present in court and would testify that this is one in the same John Berry who was convicted on that date.
>
> "THE COURT: Is that agreeable, Mr. Stern?
>
> "MR. STERN: Yes sir.
>
> "THE COURT: Is that correct? Are those facts correct?
>
> "MR. STERN: Yes sir.
>
> "THE COURT: All right. Then the verdict as to Berry is ten years in the Department of

Correction and as to Pettiford five years in the Department of Correction."

In *Simmons v. State,* 165 Md. 155, 167 A. 60, the Court of Appeals, faced with an indefinite jury verdict, resolved the uncertainty by viewing the jury's verdict in the total context in which it was given and stated the following rule:

"Where the meaning of the verdict is so unmistakable, mere inartificiality in its form will not be sufficient to defeat justice by a nullification of a verdict. . . ."

In *Couser v. State,* 256 Md. 393, 260 A. 2d 334 (1970), the Court of Appeals disposed of an indefinite mandate from this Court thus: "It is our ruling that where the mandate is ambiguous, one must look to the opinion and other surrounding circumstances to determine the intent of the court."

Thus, in the cases of ambiguous conduct by both trial juries and appellate courts, the reviewing court looks to the appropriate surrounding circumstance. A similar rule should apply in the instant case. When the trial judge has caused some uncertainty by not making a specific finding of guilt, we hold the reviewing court may look to the surrounding circumstances to determine the trial judge's intent. Looking at the record here, we find a clear intent to find appellant Berry guilty on the addendum. Further, we note that the clerk of the court reached a similar interpretation of the judge's words as evidenced by the docket entry "guilty addendum."[1]

Appellant Berry contends the trial court deprived him of his constitutional right to an attorney of his own choice. The docket entries show Nathan Stern entered his appearance for appellant Berry on August 20, 1968,

---

1. In *Smith v. State,* 5 Md. App. 633, 637, 248 A. 2d 913 we found that on a plea of guilty it was unnecessary for the trial judge to actually reach a verdict since the imposition of a sentence was sufficient.

and that when the case was called for trial on March 27, 1969, the following occurred:

"MR. STERN: If Your Honor please, as to Mr. Berry, the other Defendant, my appearance is entered. I would like to state for the Court that approximately three months ago Mr. Berry notified me that he was—

"THE COURT: How long ago?.

"MR. STERN: At least three months ago.

"THE COURT: Go ahead, I am listening.

"MR. STERN: He had informed me that he was going to get other counsel. It was my understanding that he was going to get Mr. Milton Allen, but he tells me it was Alan Murrell; that he has paid Mr. Murrell some of his fee. I have not gone over or done anything at all as far as Mr. Berry is concerned in his defense and I don't think—

"THE COURT: How long ago did he tell you that?

"MR. STERN: At least three months ago.

"THE COURT: All right. Well, Mr. Stern, there has to be an end to this sort of thing sometime. There has been ample time for any change of representation. And since your appearance is in the case, the Court is going to require you to proceed with the defense of this individual and if he has any problems with another lawyer regarding the payment of a fee and none appearance of the lawyer in connection with that, he will have to straighten that out in some other fashion. The case, however, will proceed to trial this morning.

"MR. STERN: Your Honor, really I am not prepared to represent Mr. Berry. I haven't talked to him but only one time originally about this case and I am not at all prepared in his defense.

"THE COURT: Well, I am going to call the case for trial today in any event, Mr. Stern, and you will defend him to the best of your ability.

"MR. BERRY: Your Honor, I would like to know if I could get Mr. Murrell because I didn't want him for a lawyer.

"THE COURT: I understand that, but you have had three months for this and the case is set for trial and the Court is not going to postpone the case again for this reason."

\* \* \*

"MR. STERN: May I ask the Court to give me some time to discuss this with Mr. Berry at this time.

"THE COURT: How much time do you need?

"MR. STERN: Half an hour."

Thereafter, the trial was postponed until after the luncheon recess at 2:15 P.M. We cannot say the trial judge abused his discretion in failing to grant the continuance to enable Berry to obtain new counsel. Mr. Stern's appearance had been entered seven months earlier and, according to counsel, more than three months had elapsed since Berry indicated he wished to employ other or additional counsel. If a person accused of a crime could have a continuance as a matter of right on such a flimsy presentation, many criminals would never come to trial. We discussed the principles involved in *Anderson v. State,* 3 Md. App. 362, 368, 239 A. 2d 579.

*Judgments affirmed. Pettiford to pay one-half the costs.*