# MARSHALL EDWARD CONWAY *v.* STATE OF MARYLAND

[No. 434, September Term, 1971.]

*Decided April 21, 1972.*

The cause was argued before MURPHY, C. J., and CARTER and GILBERT, JJ.

*Harold Buchman* for appellant.

*Gary Melick, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Milton B. Allen, State's Attorney for Baltimore City,* and *Peter D. Ward, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

GILBERT, J., delivered the opinion of the Court.

Marshall Edward Conway, appellant, was convicted of murder in the first degree and two charges of assault with intent to murder, at a jury trial presided over by Judge Charles D. Harris, in the Criminal Court of Baltimore. Appellant was sentenced to life imprisonment for the murder conviction and a term of 15 years incarceration on each of the assault with intent to murder charges, to be served consecutively with the life imprisonment sentence.

In his appeal to this Court, the appellant attacks the judgment of the Criminal Court of Baltimore on a sex-partite basis. We shall consider each contention *seriatim.* He contends:

"I. The intra-departmental police photographic iden-

tification procedure, when appellant was already in custody, was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification warranting the exclusion of identification evidence by Officers Nolan and Welsh.

II. The prosecution violated the sequestration rule by, without the knowledge of the court or the accused, or with the consent of the court, consulting with a key witness the night before his appearance.

III. The prosecutor denied accused a fair trial by first persistently questioning a co-defendant (indicted but not tried) despite his claim to Fifth Amendment privilege, and then in closing argument claiming erroneously, without correction by the court, that the witness had 'spilled the beans.'

IV. The court below erred in not permitting appellant to argue his case before the jury even though he had permitted him to act as his own counsel.

V. The court below erred in refusing continuance to appellant who sought new counsel and in pressing him to trial with counsel who had conferred with him only one hour in a capital case.

VI. The court should have granted the motion for judgment of acquittal."

## THE FACTS

The unprovoked, brutal and senseless slaying of Officer Donald T. Sager, a 13 year veteran of the Baltimore City Police Department, and the simultaneous attempted murder of Officer Stanley Sierakowski, a 17 year police veteran, occurred on Friday the night of April 24, 1970. Both uniformed officers usually worked as partners in one marked patrol car, but on the night of the shooting they were assigned individually to patrol in separate marked police vehicles in order "to give the people there better coverage."

Shortly after 9:00 p.m., the two officers responded to a domestic complaint at 1201 Myrtle Avenue, received

by Sager. Sierakowski arrived first and parked his vehicle. Sager soon pulled up, parked, and both officers proceeded to investigate the complaint. Sager took the complaint and "about ten minutes" later both returned to Sager's car. While seated therein, the team was alerted via a radio call to a "family thing" at the 900 block Argyle Avenue, about two and a half or three blocks away. They responded in Sager's car because "he was pointed the right way." A complaint was taken and the two officers returned to Myrtle Avenue and parked in front of 1201 Myrtle Avenue near the corner of Dolphin Street. Sager remained in the driver's seat while Sierakowski sat on "the passenger's side to the right of him." While in the midst of writing out their reports, the officers were interrupted by the woman who had earlier made the domestic complaint. They got out of the car, "looked at the area," saw no one, and returned to the car to finish their reports.

It was at this point in time that Officer Sierakowski observed "at least three, I know it was more than two there, moving around a little." He described the individuals as "Negroes * * * males * * * all about 25 or so" and said they were "joking around, moving around" in the vicinity of his patrol car parked nearby. As the group passed the patrol car in which Sager and Sierakowski were seated, "one of them came over and come right next to the car, about three inches, * * *. He seemed to smile, and I nodded to him, and went back and * * * kept writing my report." The group passed towards the rear of the car and owing to the fact that Officer Sierakowski "could hear the conversation" he "knew" that they had not crossed the street.

About two minutes after the group had passed the patrol car, the lady who had made the original complaint again tried to get the officers' attention. As he opened the door and began to alight, Officer Sierakowski "heard a volley of shots," looked over his car and "saw a motion going from the back of the car towards the building side." The officer testified that he "heard the shots, and

I saw the fire coming out of the gun. * * * four slow fires. I was struck * * *. It was four bullets in the stomach, and both of my hands were shot, and my arm was broken." Sierakowski surmised that the group which had seconds earlier passed the patrol car and the person or persons shooting at him and Officer Sager "from the rear of the car" were one and the same because "they just passed me, and there was no pause in the conversation."

The fusillade of gunfire ceased and as Sierakowski lay grievously wounded in the gutter, wedged between the curb and Sager's vehicle, a man came walking towards him, stooped over and relieved the officer of his wristwatch, and then started to "grab ahold" of his holster. "He grabbed the bottom of the holster, * * * and I hollered out, 'No,' and I don't know whether I passed out or not, but the next thing I knew, he wasn't there and I started trying to get up." Sierakowski then "started reaching for the mike. It was difficult." After his second or third attempt to reach the microphone Sierakowski noticed his partner, Officer Sager, who was "bleeding from the face and from his nose, rather, and his mouth, and he was still breathing, * * *." Officer Sager did not respond "because he was gurgling while he was breathing; the blood was gurgling in his throat." Finally, Sierakowski got a "signal 13" distress message through.

Officer Francis Frederick testified that he and Officer Billy R. Anderson, both of the Tactical Squad of the Baltimore Police Department, assigned to "high crime areas," heard a police distress signal over their radio at approximately 9:55 p.m. on the evening of April 24, 1970. They were on patrol at Argyle Avenue and Dolphin Street and it took only 15 or 20 seconds for them to arrive in front of 1201 Myrtle Avenue. Frederick alighted from his vehicle, approached the Sager vehicle and noticed "Officer Sager slumped behind the wheel of the radio car." Two ambulances were quickly summoned. Frederick observed that "both windows on the radio car, left and right rear, had been shattered by gunfire." Other officers began ar-

riving at the scene. Officer Frederick accompanied Sager to Provident Hospital where the latter was pronounced dead on arrival. An autopsy subsequently performed on Sager's body revealed that the shots which killed him were not fired at close range. Sager's gun "was still in his holster. It had not been fired." The autopsy report indicated that Sager died almost *instanter*.

Detective Charles Bruggerman of the Homicide Squad arrived at about 10:30 p.m. and began marking the evidence, "circled where the evidence was found, and had photographs taken." *In toto* Bruggerman found eight .45 caliber "shell casings and two spent projectiles inside and near the exterior of the car."

Officer Raymond Norris, on duty nearby with his partner, overheard Sierakowski's statement, "I have been shot," on his radio and was at the scene in about a minute. He rendered what assistance he could to Sager and Sierakowski. While he proceeded to "keep the area clear" he chanced to observed ".45 casings laying in the street and around the car, and on both sides of it, * * *."

Officers Roger Nolan and James Welsh, assigned to the Tactical Squad, were patrolling the area of Pennsylvania and North Avenues, in an unmarked car and in plainclothes, when, at about 9:55 p.m., on the evening of April 24, 1970, they received a signal 13 police distress signal. On their way to the scene of the shooting, they "got to the intersection of Myrtle and Fremont" and "saw two males walking hurriedly from Myrtle Avenue across an old fire house to Fremont Avenue, they had gotten to this alley * * * which is known as, its a small street * * * called Smithson Street. We stopped two males at this point and told them of the incident, and more or less questioned them about their whereabouts." The reason the officers stopped the two was because of "information * * * received over the radio * * * that the males had been running north of Myrtle Avenue from the scene of the incident." The two individuals were then patted down and placed in the police vehicle. Nolan and Welsh again continued towards the *locus criminis*.

When they got to the intersection of Fremont Avenue and Mosher Street, they "observed a lone male walking north on the east side of Fremont Avenue" three quarters of a block from where they had stopped the other two males. Officer Nolan testified:

> "Well, he was walking rather hurriedly, and the manner in which he appeared, * * *. It was very few people on the street at that time of night. He was dressed in a sweater and the temperature at that time was rather cold. The person looked to be flushed or excited, and, * * * as we pulled by him, he looked at us once or twice, * * * he more or less made jerky motions."

The officers made a U-turn at Small Street and proceeded to block passage from the crosswalk at Fremont and Mosher with their vehicle. The lone male "walked right up to the curb at Fremont and Mosher, as if to cross." When the male reached the curb where the police vehicle was stopped, Officer Nolan, seated on the passenger side with his badge plainly in sight, announced, "Police officer, and the male bent over and looked in the window of the car." The distance between the officer and the male was approximately three and one-half feet. The area was well illuminated as a result of various light sources at each quadrant of the intersection of Fremont and Mosher. Light shining from an "Esso Filling Station" on the southwest corner of the intersection just about illuminates the whole area.

Nolan observed the man for "maybe thirty seconds or a minute," and was thus able to supply a detailed portrait of the male's physiognomy and raiments. "He was a Negro, male; * * * in the mid-twenties, and had a short bush haircut. * * *. He had a little hair on his chin, * * *, small goatee, and he was about medium-dark complected, * * * six feet, or six-one, and he was thin. He had on a black sweater and a V-necked sweater, * * *. He had the sleeves rolled up, both sleeves. He was

wearing dark pants that appeared to be levis. He was wearing combat boots * * *."

The man backed up a few steps, turned around and ran. Officer Welsh stayed in the police vehicle with the two suspects detained earlier, while Nolan gave chase. The male ran south on Fremont Avenue. In pursuit for several blocks, Nolan lost sight of the man for a brief period when he ran behind a house on Mosher Street. Nolan ran towards the direction of the house and was only "ten yards" behind the man when he, Nolan, heard a "metallic sound" which "sounded like a weapon or automatic slide." Nolan "got a little excited" and the "first shot went off * * * maybe a yard or so away." The officer was "blinded" momentarily, fell down and was shot at several more times as he tried to get up. Attempting to dodge the gunfire he made a lunge at a wire fence nearby, was shot at again, and finally took refuge behind a telephone pole. He felt bullets striking the pole and then managed to return the fire. Though not hit by gunfire, the officer injured his hip and cut his face as he dove at the fence.

Nolan testified that he had previously seen this man a "few times" one or two months before the shooting in the area of Pennsylvania Avenue and Mosher Street when Nolan had worked "foot patrol" there. He did not know the man by name, but the face was familiar to Nolan, and Nolan was "quite familiar with a lot of people that live down in that neighborhood, and especially most of the men." Officer Nolan had lived in the neighborhood "for about twenty-six years."

Following the exchange of gunfire between Officer Nolan and the lone male, the latter was last seen by Nolan "hightailing it" into the night. Eventually Nolan went home at about 5:00 a.m. on the morning of Saturday, April 25, 1970.

Lieutenant Thomas McKew of the Homicide Division of the Police Department testified that on the morning of April 26, 1970, at 12:30 a.m., he personally arrested the appellant at the U.S. Post Office on Calvert and Fayette Streets, in Baltimore. The arrest was executed

pursuant to an arrest warrant premised upon murder and assault with intent to murder charges. The charges were in turn predicated upon evidence obtained during the investigation of the April 24th incident.

## THE PHOTOGRAPHIC IDENTIFICATION

Appellant firstly urges that we should depart from our previous holdings relative to photographic identification procedure, at least to the extent of qualifying those decisions. He argues that we should follow the reasoning of *United States v. Zeiler,* 427 F. 2d 1305, (3rd Cir. 1970), and the more recent case of *United States v. Ash,* 10 Cr. L. 2408, decided March 1, 1972 by the United States Court of Appeals for the District of Columbia.

Appellant grounds his argument on the factual situation surrounding the photographic identification and earnestly entreats that the procedure was impermissibly suggestive. Mr. Justice Harlan, writing for the Supreme Court, in *Simmons v. United States,* 390 U. S. 377, 88 S. Ct. 967, 19 L.Ed.2d 1247 (1968), said:

"Despite the hazards of initial identification by photograph, this procedure has been used widely and effectively in criminal law enforcement, from the standpoint both of apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs. The danger that use of the techniques may result in convictions based on misidentification may be substantially lessened by a course of cross examination at trial which exposes to the jury the method's potential for error. We are unwilling to prohibit its employment, either in the exercise of our supervisory power or, still less, as a matter of constitutional requirement. Instead, we hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial fol-

lowing a pre-trial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."

The testimony in the instant case, relative to the identification, can be summarized as follows: On the afternoon of April 28, 1970, Officers Nolan and Welsh were separately shown two series of photographs by other police officers. Officer Nolan identified five photographs in the group first shown to him on April 28. He made a "partial selection" of a photograph that he thought resembled his assailant, but he was not sure because the person depicted seemed to him to be younger and of a darker complexion than his assailant. It was, however, established that the photograph the officer partially identified was a 1963 photograph of the appellant. Later, on the same day, Officer Nolan made a positive identification of the appellant from another batch which included a 1970 photograph of the appellant. As previously mentioned, the officer testified that he had seen the appellant several times before the shooting while he, the officer, had been working foot patrol in the area, and that he had an excellent opportunity the night he was being shot at to observe his assailant's face.

Officer Welsh made separate identifications of the photographs, including a tentative selection of the 1963 photograph and a positive identification of the 1970 one. The appellant argues that the photographic procedure was impermissibly suggestive and that inasmuch as the appellant was in custody the entire procedure was illegal under *United States v. Ash, supra.*

This Court in *Smith and Samuels v. State,* 6 Md. App. 59, 67-68, 250 A. 2d 285 (1969), said:

"Evidence of the identity of the defendant may be challenged by a motion to exclude or suppress such evidence made before or during

trial or by an objection to the evidence when it is offered. Md. Rules 725, 522. If the motion is made before trial it may be determined by the court before trial or the court may order that it be deferred for determination at the trial of the general issue. Rule 725d. When the determination of the admissibility of the challenged evidence is made during a trial before a jury, evidence on the issue shall be received out of the presence of the jury. At the hearing on the issue raised by the challenge the burden is on the defendant to show, *prima facie,* that the pre-trial confrontation or viewing of photographs was illegal, and if he so shows, the burden shifts to the State to show by clear and convincing evidence that it was legal. If the court finds that the State has met its burden and that the pre-trial confrontation or viewing was legal, an in-court identification by the witness present at the pre-trial confrontation or viewing is admissible as substantive evidence. * * *."

No evidence was produced by the appellant at the hearing on the contested pre-trial identification, and the burden of showing, *prima facie,* the illegality of the photographic identification was therefore not met.[1]

*Zeiler* extended the holdings of the Supreme Court in *United States v. Wade,* 388 U. S. 218, 87 S. Ct. 1926, 18 L.Ed.2d 1149 (1967), and *Gilbert v. California,* 388 U. S. 263, 87 S. Ct. 1951, 18 L.Ed.2d 1178 (1967), so as to

1. We do not fault trial counsel because of the failure to produce evidence contesting the pre-trial photographic identification. Counsel was handicapped by the irascible conduct of the appellant who voluntarily absented himself from the trial because of advice received from one Arthur Turco, a member of the New York Bar and a cell mate of the appellant at the time of trial. Turco was awaiting trial on an unrelated charge. Appellant demanded that Turco be appointed to defend him but Judge Harris observed that Turco was in jail on a non-bailable offense and that he, the judge, was unable under the circumstances to appoint Turco. Appellant refused to cooperate with his court-appointed counsel.

require the presence of counsel at photographic identifications when the accused is in custody.

We held in *Crenshaw v. State,* 13 Md. App. 361, 283 A. 2d 423 (1971), that there is no constitutional right to counsel at such a proceeding. The Second Circuit in *United States v. Bennett,* 409 F. 2d 888 (C.A.2 1969), *cert. denied,* 396 U. S. 852, 90 S. Ct. 113, 24 L.Ed.2d 101, reh. denied, 396 U. S. 949, 90 S. Ct. 376, 24 L.Ed.2d 256, said:

> "* * * to require that defense counsel be allowed or appointed to attend out-of-court proceedings where the defendant himself is not present would press the Sixth Amendment beyond any previous boundary. None of the classical analyses of the assistance to be given by counsel, (citations omitted) suggests that counsel must be present when the prosecution is interrogating witnesses in the defendant's absence even when, as here, the defendant is under arrest; * * *"

Counsel is to be provided rather at trial so as to prevent a defendant from falling into any traps that may be devised by the opposing attorney, and to ascertain that a defendant is afforded all available defenses. *United States v. Bennett, supra.*

There is nothing in *Gilbert* or *Wade* that requires counsel for the accused to be present at a photographic identification irrespective of whether or not the accused is in custody. *United States v. Ballard,* 423 F. 2d 127, (5th Cir. 1970), *Crenshaw v. State, supra.*

The United States Court of Appeals for the District of Columbia in *Ash v. United States, supra,* has become the second federal appellate court to extend *Wade.* However, *Ash* seemingly provides some qualifications on *Zeiler* in that the majority [2] recognized that there may

---

2. *Ash v. United States* was a five to four decision, the court sitting *en banc.*

be circumstances that would justify an exception to *Zeiler's* general requirement of counsel, saying:

> "There are instances in which a photographic exhibition—even though an event capable of being adduced at trial—is too preliminary and preparatory to be regarded as a critical stage of the prosecution requiring attendance of defense counsel. Certainly when a case is in the pre-arrest investigative stage there is justification for photographic viewings, assuming no undue suggestiveness, *Simmons v. United States,* 390 U. S. 377 (1968). There is obvious need in terms of effective police investigation to ask the victim or other witness to view photograph books organized by the police in terms of modus operandi and nature of offense."

Another exception noted by the majority was a case where, in an on going investigation, time is of the essence and the need for photographs is an integral part of the investigative procedure. Such an exception, however, is limited by *Ash* to "special circumstances." The majority held:

> "In the circumstances of this case, defendant's constitutional right to counsel at critical stages of the prosecution was violated when the Government, having him in custody, and having failed to arrange a corporeal lineup, made a photographic presentation to witnesses without attendance of counsel. The Government's insistence on admission of these color photographs at the trial produced reversible error."

We think the reasoning of the dissent in *Ash* to be more persuasive. There the minority said:

> "It is noteworthy that in Wade, where the Court remanded the case for a hearing as to whether the in-trial identification had an inde-

pendent untainted origin, the Court, in describing the ways in which the independent recollection of the witness could be proved, listed 'the identification by picture of the defendant prior to the lineup.' This is a plain inference that pretrial photographic identification—without the presence of counsel—is an accepted investigatory or preparatory technique and is relevant proof of the validity of the in-trial identification.

\* \* \*

"What makes Wade a Sixth Amendment right case—and why Ash is not—is that Wade was deprived of his counsel's presence at a time and place where it counted—the lineup. The lineup is truly a 'critical stage' of the prosecution at which the Sixth Amendment requires counsel \* \* \*. Not so with appellant Ash. He had no counsel present—neither was Ash—when the prosecuting attorney was displaying photographs to government witnesses in preparation for trial. But at trial his counsel was under no handicap in his defense, for two reasons: (1) the inherently different nature of a photographic identification from a lineup, and (2) the full pre-trial due process hearing at which defense counsel familiarized himself thoroughly with the preceding events and anticipated testimony."

We rejected Zeiler in Crenshaw, supra, and subsequently in Cooper v. State, 14 Md. App. 106, 286 A. 2d 579 (1972). Our reading of Ash fails to convince us that we should reverse or modify our previous holdings.

The United States Courts of Appeals for the Second, Fourth, Fifth, Sixth, Seventh, Ninth and Tenth Circuits have explicitly refused to extend Wade, and have thereby refused to adopt the rationale of Zeiler. Our sister states of California, Mississippi, North Carolina, Illinois, Washington, Wisconsin, Delaware, Massachusetts, Flor-

ida and Arkansas have all, in addition to us, declined to adopt the rationale of *Zeiler*. Our perusal of the record in the instant case leads us to the conclusion that the utilized photographic identification was not impermissibly suggestive and, therefore, not in violation of *Simmons v. United States, supra*. We again specifically reject *Zeiler* and we reject *Ash*. As we noted in *Crenshaw*, the overwhelming weight of authority supports our position. The divergence of opinion expressed by those United States Circuit Courts of Appeals which have considered and ruled on the question exemplifies what is classically known in academic legal parlance as a "conflict of circuits" or split of authority, which may ultimately and bindingly be resolved by the court of last resort, the Supreme Court of the United States.

## THE SEQUESTRATION RULE

The appellant secondly contends that Maryland Rule 753 entitled "Witness-Exclusion" and dealing with sequestration of witnesses was violated by the prosecutor and that Judge Harris should have granted a motion for a mistrial as a result of the alleged violation.

The factual situation upon which this argument is predicated deals with the testimony of a Mr. Charles S. Reynolds, a former cell mate of the appellant, who was called as a witness for the State. The record reveals that on re-direct examination Mr. Reynolds stated that on the night before his testimony he had been furnished with a copy of a statement that he had previously made. Reynolds testified that he "went over it" in the presence of Mr. Ward, the prosecutor, Detective Joseph Thomas and Detective Sheppard. Recross-examination of the witness produced the following:

DEFENDANT'S TRIAL COUNSEL:

Q "Just one question, Mr. Reynolds. You said last night you went over the statement with Mr. Ward and Detective Thomas.

A I did, sir.

Q Detective Thomas discussed the statement with you?

A I read the statement myself.

Q Yes?

* * *

Q What, if anything, did Detective Thomas do?

A Nothing.

Q He just stood there?

A He was just present.

Q But you discussed it with Mr. Ward, didn't you?

A They gave me the statement. I went over it and I told them about the mis-statements, mistakes that the Court Reporter had made.

Q Did you tell them about the mistake on the date?

A I did tell Mr. Ward that.

Q What other mistakes did you tell them about?

A About the spelling of the Maryland House of Correction, and I think about the police man being white."

Following the witness' testimony, the court adjourned for the day. The next morning, out of the presence of the jury, defense counsel made a motion for a mistrial, saying:

"I would make a motion for a mistrial, because it's my feeling that inasmuch as the Court had granted the motion to sequester all witnesses, Mr. Ward should not have the right to talk to witnesses during the course of the trial."

Judge Harris then required that Reynolds' testimony be read back to the court and explained to the appellant, who was brought into the courtroom from which he again voluntarily absented himself, the nature of the proceedings. The appellant then moved, in proper person, for a

mistrial and quoted at length from a motion written for him by another person. The appellant then voluntarily left the courtroom. No ruling was made on the appellant's motion at that time. Additional testimony was heard concerning Reynolds having been a cell mate of appellant's in the City Jail.

The records kept by the Baltimore City Jail revealed that Reynolds and appellant were cell mates on the 19th, 20th, 21st, 22nd and 23rd of May, 1970. The prosecutor then made a proffer to the court that he had met with Mr. Reynolds at the Baltimore County Jail and told him that he, Reynolds, would probably be called to testify the next morning. Ward then told Judge Harris:

> "Detective Thomas and [Detective] Sheppard were present in the room, and had nothing to do, and did not make any statement or comment to Reynolds with respect to his statement, and did not examine him with respect to his statement, and they, neither they nor I discussed with Reynolds any testimony that had been given in this case by any witness, and my purpose for doing it, of course, was to have him read the statement and refresh his recollection if he found it necessary to be refreshed. They left with me, Detective Thomas and Sheppard, and drove me home. That would be my statement."

Judge Harris then denied the motion for a mistrial and stated, in part:

> "* * * it seems clear to me that the purpose of Rule 753 has not been violated by the facts, as I understand them. The purpose of the rule, * * * is to prevent one witness from communicating his testimony to another witness who has not testified. I'm certain from what Mr. Ward has said that was not done. The statement which had been previously given by the witness Rey-

nolds was made available to defense counsel for cross-examination purposes. It seems clear that if the witness had deviated from the statement, that too would have been brought out by the defense counsel. It seems clear to me in summary, that the purpose of the rule has not been violated, and for that reason, I'll deny the motion for mistrial."

Significantly, no motion to exclude the testimony was made when it was first offered, and it was not until the morning of the next day that appellant moved for the mistrial, assigning as reason therefor what he believed to be a violation of Rule 753, which provides:

"The court may upon its own motion and shall, upon the request of a party, order that the witnesses be excluded from the courtroom until called upon to testify. An expert witness, who is to render an opinion based on the testimony given at the trial, shall be excepted from the operation of this Rule."

Additionally, appellant asserts that the trial judge's failure to exclude Reynold's testimony because of the violation of the Rule constitutes an abuse of discretion. We disagree. The primary purpose of the Rule is to prevent prejudice and to insure against, insofar as possible, one prospective witness from being taught, schooled or prompted by hearing another witness' testimony. The application of the Rule avoids artificial harmony and allows the trier of the facts to weigh all of the testimony. *Burton v. State Roads Commission,* 251 Md. 403, 247 A. 2d 718 (1968); *Pinkney v. State,* 12 Md. App. 598, 283 A. 2d 800 (1971); *Jones v. State,* 11 Md. App. 468, 275 A. 2d 508 (1971); *Hill v. State,* 9 Md. App. 65, 262 A. 2d 573 (1970); *Hurley v. State,* 6 Md. App. 348, 251 A. 2d 241 (1969).

## PROSECUTORIAL INTERROGATION OF WITNESS CLAIMING FIFTH AMENDMENT PRIVILEGE AND PROSECUTORIAL CLOSING ARGUMENT COMMENTS

Appellant's third argument is actually bifurcated, i.e., the prosecutor denied the accused a fair trial by his persistent interrogation of a co-defendant who utilized his Fifth Amendment privilege against self-incrimination and reference in the closing argument by the prosecutor to the same witness having "spilled the beans."

In an *in-camera* conference, Jack Ivory Johnson, the co-defendant, indicated that he was hesitant about testifying for the State notwithstanding a promise of immunity. Judge Harris agreed to allow Johnson more time to consider whether or not to testify. Subsequently, Johnson was called as a witness by the State and after having his rights explained to him in the presence of the jury, at the specific request of appellant's trial counsel, the witness Johnson declined to testify. The Assistant State's Attorney expressed surprise and interrogated the witness. Here, appellant argues that the State should not have been allowed to question the witness. It is clear from the record that the witness received a full explanation of his constitutional right not to testify. No motion for a mistrial was made either during or after the State's interrogation of the witness, nor was any request made that the jury be instructed to disregard the testimony of the witness.

The Court of Appeals, in the case of *Vandegrift v. State,* 237 Md. 305, 308, 206 A. 2d 250 (1965), quoted from 86 A.L.R.2d 1443, 1444-1445, and enumerated five requirements for a court's finding of prejudicial error. The five requirements are:

> "1. that the witness appears to have been so closely implicated in the defendant's alleged criminal activities that the invocation by the

witness of a claim of privilege when asked a relevant question tending to establish the offense charged will create an inference of the witness' complicity, which will, in turn, prejudice the defendant in the eyes of the jury;

"2. that the prosecutor knew in advance or had reason to anticipate that the witness would claim his privilege, or had no reasonable basis for expecting him to waive it, and therefore, called him in bad faith and for an improper purpose;

"3. that the witness had a right to invoke his privilege;

"4. that defense counsel made timely objection and took exception to the prosecutor's misconduct; and

"5. that the trial court refused or failed to cure the error by an appropriate instruction or admonition to the jury."

An examination of the record fails to reveal that any testimony whatsoever concerning Johnson was offered during the course of the trial prior to the time that he was called as a witness. The questions posed to Johnson by the State were directed primarily to the grant of immunity. We do not agree with the appellant that the prosecutor in the case at bar made a conscious and flagrant attempt to bolster his case by the use of inferences arising out of the witness' employment of testimonial privilege.

We do not find on the record that the first requirement of the five points enumerated in *Vandegrift* has been met.

As to the second point in *Vandegrift*, there is nothing in the record to indicate that the prosecutor knew that Johnson was anything more than "hesitant" about testifying, and there is no showing that the Assistant State's Attorney had no reasonable basis for expecting the witness to waive his Fifth Amendment rights in view of the

promise of immunity, nor that the witness was called by the State "in bad faith and for an improper purpose."

The third point is clearly present in that the witness did have a right to invoke his constitutional privilege against self-incrimination.

The fourth criterion in *Vandegrift* was partially met in that trial counsel did make a timely objection and took an exception to the prosecutor's conduct. We refrain, however, from the use of the term "misconduct" as set forth in the fourth point of *Vandegrift* as we perceive no "misconduct."

The fifth point of *Vandegrift* is likewise not present in the instant case in that there was no request to the trial court that an instruction be given to cure the error or any type of admonition to the jury.

In *Vandegrift,* the Court of Appeals found that four of the five criteria had been satisfied, and reversed and remanded for a new trial.

Our examination of the record shows that only the third requirement and part of the fourth have been satisfied. While we do not imply that all of the criteria need be met (see *Vandegrift*) more must be present than here inasmuch as all we are confronted with in the instant case is No. 3, that the witness did invoke his privilege, and part of No. 4, that defense counsel made an objection. Those two points are insufficient in law, under the circumstances to indicate prejudicial error.

We think that the Assistant State's Attorney did no more than follow the procedures outlined by the Court of Appeals in *Midgett v. State,* 223 Md. 282, 164 A. 2d 526 (1960), *cert. denied,* 365 U. S. 853, 81 S. Ct. 819, 5 L.Ed.2d 817; *Royal v. State,* 236 Md. 443, 204 A. 2d 500 (1964); *Shifflett v. State,* 245 Md. 169, 225 A. 2d 440 (1967), which cases mandate that because of the elusive character of the privilege against self-incrimination, *Gardner v. State,* 10 Md. App. 691, 696, 272 A. 2d 410 (1971), which may vary from question to question, the questions must be propounded to the witness on the stand on a one-by-one basis; the witness must then evaluate

each question severally and decide, question by question, whether to assert his privilege or not. The trial judge must then decide on an individual question basis whether the privilege has been properly asserted or whether he, the judge, must compel the answer under threat of contempt. See also 3 Wharton's *Criminal Evidence* (Anderson Edition 1955), p. 37; 98 C.J.S., *Witnesses,* § 436; *Pope v. State,* 7 Md. App. 533, 537, 256 A. 2d 529 (1969) ; *Gardner v. State, supra.*

It is significant to note that at the conclusion of the questioning of the witness Johnson the State prosecutor made the following statement for the record:

> "MR. WARD: Let me just make a point for the record with respect to Jack Johnson. It is, of course, clear in the record that he was brought into chambers a couple days ago. In your chambers he said he would like to testify. I want the record to be clear that I had no contrary indication, that is, indication that he was not going to testify since that time. My calling him was based upon his assertion on the record that he would testify. \* \* \* I just wanted it to show that he hadn't come to it this morning, and I called him anyway for the effect, anyway."

Judge Harris responded:

> "I think that counsel, and the Court and [counsel for Johnson] will all agree that Johnson in the chambers of the Court the day before yesterday did state that he would testify, and that his refusal on the witness stand today to testify came as a complete surprise to the State, to the defense, and to Johnson's own counsel, and to the Court."

We have meticulously examined the record and fail to find that anyone disagreed with the court's statements.

The second phase of appellant's bifurcated attack is directed towards the remarks made by the Assistant

State's Attorney in closing argument. Mr. Ward said to the jury:

> "You recall this was after the testimony as to how Johnson had been arrested, and Powell, and after, as Lieutenant McKew testified, Johnson had spilled the beans on his cohort, Mr. Conway."

Trial counsel immediately objected and the court overruled the objection on the basis that:

> "* * * this argument is not evidence, and secondly, my recollection and notes indicate that on the cross examination of the witness [McKew] that the word stool pigeon was used at some stage. * * * I do believe that the word was used, or the term was used at the time that [defense counsel] cross-examined the witness, Mr. McKew."

The term "stool pigeon" was employed in the case as a result of the cross-examination of Lieutenant McKew by appellant's trial attorney. The record reveals:

DEFENSE COUNSEL:

"Q * * * Now, you got this warrant on information received, did you not?

A It was obtained on information received.

Q * * * Evidence obtained during the investigation?

A Yes.

Q And, the evidence was obtained through a stool pigeon; is that correct?

A Not all told. It was some other circumstances involved in that.

Q But the main thing was what some stool pigeon had told you?

A Partially; partly.

Q As a result of that, what the stool pigeon had told you, you went back and checked over the

> police records to see if you had a picture of
> Mr. Conway; is that right?
> A Yes, sir."

On cross-examination the witness was asked by the State to name the "stool pigeon." The answer of Lieutenant McKew was:

> "Jack Ivory Johnson gave us certain facts as
> to what had occurred, but while I was present,
> he didn't give any identification."

We believe, under the circumstances, the argument made by the Assistant State's Attorney was proper. The term "stool pigeon" was first utilized by the appellant's trial counsel. The use of the colloquialism "spilled the beans" is but the synonymous end product of the term "stool pigeon."

We perceive no error and think that the comments employed here were clearly fair comments on the evidence and did not "exceed the limits of permissible comment." *Holbrook v. State,* 6 Md. App. 265, 250 A. 2d 904 (1969); *Ott v. State,* 11 Md. App. 259, 273 A. 2d 630 (1971); *Chandler v. State,* 7 Md. App. 646, 256 A. 2d 695 (1969).

## RIGHT *VEL NON* OF APPELLANT TO MAKE A STATEMENT BEFORE THE JURY *PRO SE*

Appellant contends that Judge Harris "denied him permission to make a statement to the jury." The statement that the appellant wanted to make to the jury was apparently in lieu of testifying. He was asked by his counsel if he desired to make closing argument to which the appellant replied, "No. It's not going to be closing argument. I want to state something to them."

Appellant's trial counsel did make an extensive closing argument. There is no requirement in Maryland law that an accused, represented by counsel, be entitled "as a matter of right" to actively participate in his trial. See

*Shelton v. State,* 3 Md. App. 394, 239 A. 2d 610 (1968). Cf. *Midgett v. State, supra,* wherein the appellant persistently declined the assistance of counsel and argued his own cause, the Court of Appeals holding that one who elects to try his own case *pro se* as a matter of deliberate choice is subject to the same rules of reviewability and waiver of questions not raised below as one who is represented by counsel.

## TRIAL COURT'S REFUSAL TO GRANT A FURTHER CONTINUANCE

Appellant penultimately argues that the trial court should have granted a continuance of the case to allow him to obtain new counsel. He concedes that he "cannot dispute that the Court had set the case for trial on two occasions and had appointed new counsel after appellant had expressed dissatisfaction with the earlier court-appointed counsel. Nor can there be any successful attack on the competency of the trial counsel nor on the large area of discretion reposed in the court in determining the matter of continuance."

Appellant does, however, contend that he sustained a complete loss of confidence in his trial counsel and that counsel had spent only one hour in conference with him before trial. What the appellant is seeking to do is to circumvent our earlier decisions that while an accused has a constitutional right to counsel, he does not have the right to specify what attorney will be appointed to represent him. See *English v. State,* 8 Md. App. 330, 259 A. 2d 822 (1969).

The question of continuance of the case was in the sound discretion of the trial court. The record reveals that Judge Harris had continued the matter on three previous occasions for a period of two months. Appellant's trial attorney had received from the appellant's previous counsel extensive notes concerning the case and was by his own statement ready for trial. We think appellant's election not to cooperate with his counsel and

his refusal to attend all but selective portions of the trial were tactics employed by him to obfuscate the trial and an effort to gain a continuance, or, in the event of a conviction, a reversal. Whatever reason the appellant may have had, we find no abuse of discretion by Judge Harris in refusing to again continue the case. *Pettiford and Berry v. State,* 8 Md. App. 560, 261 A. 2d 216 (1970) ; *Nichols v. State,* 6 Md. App. 644, 252 A. 2d 499 (1969) ; *Johnson v. State,* 10 Md. App. 652, 272 A. 2d 422 (1971) ; *Harris v. State,* 6 Md. App. 7, 249 A. 2d 723 (1969).

## SUFFICIENCY OF THE EVIDENCE

Finally, appellant argues that Judge Harris should have granted a motion for judgment of acquittal made at the close of all the evidence. He argues that there was no evidence legally sufficient to permit the jury to consider the question of the appellant's guilt. The test for sufficiency of the evidence in a jury trial is whether the evidence, if believed, either shows directly or supports a rational inference of the facts to be proved, from which the jury could fairly be convinced, beyond a reasonable doubt, of the defendant's guilt. *Young v. State,* 14 Md. App. 538, 288 A. 2d 198 (1972) ; *Williams v. State,* 5 Md. App. 450, 247 A. 2d 731 (1968) ; *Ott v. State,* 11 Md. App. 259, 273 A. 2d 630 (1971) ; *Hunt v. State,* 12 Md. App. 286, 278 A. 2d 637 (1971).

Summarizing the evidence presented by the State at the point when the motion for judgment of acquittal was made, Judge Harris had before him (1) a photographic identification of the appellant as the person who shot at Officer Nolan, which said identification was made by both Officers Nolan and Welsh; (2) the introduction of the photographs of the appellant into evidence; (3) expended .45 caliber cartridges found near the police vehicle in which Officer Sager was killed and Sgt. Sierakowski was severely wounded, and identical casings found in the alley where the gun battle occurred between Officer Nolan and appellant; (4) the ballistics testimony

that the shells found near the police car and the casings found in the alley were fired from the same pistol; (5) projectiles from a .45 caliber pistol found in Officer Sager's body and Sgt. Sierakowski's body were compared by ballistic experts with projectiles found in the alley on West Mosher Street after the gun fight between Officer Nolan and the appellant, and were found to have been fired from the same gun; (6) the testimony of Charles Reynolds, who was a cell mate of the appellant in the City Jail, that appellant told him that he, appellant, "had went by the Panther office and some of his friends gave him some cough syrup and he smoked marijuana that particular night, and he said that after he had drank it, it gave him hallucinations and made him very violent, * * *." Reynolds further testified that, according to appellant, Johnson and Powell had fired into the police car containing Officer Sager and Sgt. Sierakowski and that appellant shot at Officer Nelson. The testimony of Reynolds, if believed, placed the appellant at the scene of the crime. Reynolds, however, admitted that in exchange for his testimony he was "hoping" that he would receive "early parole." Actually, Maryland authorities promised to advise the Michigan Parole Board of Reynolds' cooperation in the case.

We believe that the evidence presented by the State was not only sufficient to send the matter to the jury for its consideration, but that it was overwhelmingly and clearly established that the wilful, wanton and malicious murder of Officer Sager while the officer sat quietly in his police vehicle completing a report involving an unrelated domestic disturbance. The identical evidence sustains the convictions of a similar wilful attack on Sgt. Sierakowski.

*Judgments affirmed.*