### GEORGE ERVIN PINKNEY *v.* STATE OF MARYLAND

[No. 688, September Term, 1970.]

*Decided August 5, 1971.*

The cause was argued before MURPHY, C. J., and ORTH and GILBERT, JJ.

*Frank Cannizzaro, Jr.,* for appellant.

*Gilbert Rosenthal, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Alfred T. Truitt, Jr., State's Attorney for Wicomico County,* and *Charles E. Moylan, Jr., State's Attorney for Baltimore City,* on the brief, for appellee.

GILBERT, J., delivered the opinion of the Court.

George Ervin Pinkney was convicted by the Circuit Court for Wicomico County jury of murder in the first degree without capital punishment. His contentions on appeal to this court are:

1. He was convicted solely on the testimony of an accomplice.

2. The errors of the trial judge denied him a fair and impartial trial.

3. That the evidence was insufficient to convict.

4. Violation of Rule No. 753 (sequestration of witnesses) and denial of a motion for mistrial.

5. The court's refusal to allow the Appellant to testify out of the presence of the jury concerning a search of his person.

The facts of the case are that on September 5, 1968, at approximately 7:00 p.m., the Harlem Liquors, a pack-

age goods store in Baltimore City, was robbed at gun point and Robert Branch, a 70 year old man was shot to death by the robber. The owner of the liquor store, Philip R. Weiner, testified that "a man entered the store, ran up to my clerk, put a gun in his face and said, 'This is a stickup' and two shots were heard." The gunman took one or two shots at Weiner but fortunately missed. Weiner obtained a revolver from behind the counter, fired one time, and struck the felon on the right side in the region of his arm and shoulder. "He put up his hand and turned around and ran toward the door and I fired two, three shots more. By that time he fell flat on his face in the store and stretched out as if he were dead." Weiner then went to assist Robert Branch and while he was doing that the holdup man fled. He described the holdup man as a black man, wearing sunglasses. The sunglasses and revolver used by the robber, and which had been dropped at the time he was shot by Weiner, were recovered. At the trial Weiner was unable to identify the Appellant. Mr. Branch died four hours later as a result of a gunshot wound through the brain.

Baskerville, an employee of Weiner, was in the store at the time and he too was unable to identify the gunman. He fled when the shooting started.

The State produced Robert Lee Robinson, an admitted accomplice in the crime, who testified that he met Pinkney the night of the crime in a house belonging to Joe Moore, and that the three of them, Pinkney, Moore and Robinson drove to West Baltimore, and that he (Robinson) and Moore went into the liquor store in order to "case the place." While he was in there Pinkney came in and said, "This is a stickup." Robinson stated he "didn't have no idea no stickup was coming" and that neither he nor Moore were armed. He and Moore "took cover in the store. Next, I heard two shots fired. Then I heard several more shots fired." He identified Pinkney as the man who fired the first shots and said they were fired toward the counter at the man who was "waiting on me." While Weiner was bending over to help Branch,

the victim, Robinson returned to the front of the store and found Pinkney lying on the floor. He then ran. Robinson later went back to Moore's house. Moore was already there, as was Pinkney. Also present was James Ashe.

Ashe testified that he was a student at the University of Maryland School of Nursing and had been prior to that time employed at the Good Samaritan Hospital in Baltimore City as a licensed practical nurse. He stated that on the evening of September 5, 1968, around 8:00 p.m., he received a phone call from a friend he had known for 20 years, asking him if he would see "a friend." At about 9 o'clock he received a second phone call from the same person, repeating the request. Subsequently, a third phone call was received in which he was told that the person he was to see "had been playing around with a gun and he was shot." Ashe states he advised the caller to take the injured person to the nearest hospital. In response to a fourth call, the person later identified to be the Appellant, was taken to Ashe's home. Ashe identified the Appellant in open court and testified that the Appellant was wounded in the right upper arm in the area of the bicep and in the upper part of his right hip below the belt. He advised that Pinkney be removed to the hospital, which advice was refused. Appellant was then removed from Ashe's home. Later that night, somewhere between 10:30 and 11:00 Ashe received another telephone call and suggested certain medication. In response to this call, he went to a house on South Paca Street where he treated Appellant. He described the wounds, after qualification, as "gunshot wounds." In addition to Appellant, there were two other persons there, one of whom he had known all his life and identified as Robert Lee Robinson, the accomplice. Robinson was brought into the courtroom for the specific purpose of having Ashe identify him, which he readily did.

The police had ascertained Ashe's identity as a result of their investigation and he gave them a statement. He also admitted he was paid for his services to Pinkney.

Appellant's attorney moved for a mistrial at this stage on the ground that the sequestration rule was violated, and his motion was denied.

Thereafter, the State produced Sgt. George Christian, a detective of the Baltimore City Police Department, Homicide Squad, of 12 years experience as a police officer and 4 years in homicide. He testified that he had seen 400 to 500 gunshot wounds during his experience with the homicide squad.

At 4:50 a.m. on May 1, 1969, armed with a warrant for Appellant's apprehension, he went to the apartment of Mattie Brown, Appellant's girl friend, on Springdale Avenue in Baltimore, and was admitted into the apartment by Miss Brown, who directed him to the bedroom where he observed Pinkney lying in bed. Christian testified that the *Miranda* [1] rights were read in toto to Appellant and that no statement was obtained. At the time of the making of the arrest, the Sergeant stated that he observed that Pinkney was limping and he asked him to pull down his shorts; whereupon he observed a bullet hole "in his right buttocks." According to Christian, Pinkney stated, "That was foreign matter and let it go at that." Christian testified, "It appeared to be healing —have healed up." Objection was made by the defense as to any testimony of Sergeant Christian relative to his search of Pinkney at the time of the arrest, but the objection was overruled after some discourse, upon which we will comment more fully later on herein, and the Sergeant was allowed to testify. Christian denied under cross-examination that he had yanked or pulled down Pinkney's underwear.

Appellant testified in his own behalf and admitted that the wound in his buttocks and arm were gunshot wounds. He denied any participation in the robbery - murder and stated that he had received the gunshot wounds as a result of selling fake packages of dope to an irate purchaser who shot him. Appellant acknowledged that he

___

1. *Miranda v. Arizona*, 384 U. S. 436, 16 L.Ed.2d 694, 86 S. Ct. 1062 (1966).

had been treated by Ashe and did not testify concerning his search by Sergeant Christian at the time of the arrest other than to say that the gunshot wounds in his body were the same ones that Sergeant Christian had observed. He did not know the name of the person to whom he sold the "dummy" bags of drugs, and admitted that he had used heroin. He said that he was shot about an hour and a half after he had made the "sale" at Portland and Emory Streets in South Baltimore.

We cannot agree with the Appellant that he was convicted on the uncorroborated testimony of Robinson, the admitted accomplice. Only slight corroboration is necessary to sustain the conviction provided it "tends either to identify the accused with the perpetrators of the crime, or to show his participation in the crime itself." *Christopher and Klimp v. State,* 9 Md. App. 277 (1970), *Spies v. State,* 8 Md. App. 160 (1969), *Boone v. State,* 3 Md. App. 11 (1968), *Burley v. State,* 5 Md. App. 469, 472 (1968). The testimony of the accomplice was that the Appellant was the gunman who shot and killed Mr. Branch on September 5, 1968 during the course of the holdup. The owner of the store, Weiner, established that he had shot the gunman in the upper right shoulder region and fired two or three more shots, knocking the bandit to the floor. Ashe treated Appellant for gunshot wounds of the buttocks and right bicep area on the same night as the holdup shooting and after having been called by telephone within minutes after the actual occurrence. We think the testimony is legally sufficient to carry the case to the jury on the question of Pinkney's guilt of murder and robbery and satisfies the test.

Pinkney asserts that "the totality of the evidence produced before the jury in Salisbury could not have been sufficient to convict him." He points to the fact that neither Weiner nor Baskerville could identify him as the gunman. He contends the only evidence linking him to the crime were the wounds in his body and that he explained them fully to the jury. His argument overlooks the testimony established in the State's case and

selects as its basis only the inability of Weiner and Baskerville to identify Appellant. The jury did not choose, as does Pinkney, to ignore Robinson and Ashe whose testimony, if believed, was legally sufficient to sustain the conviction. *Burley v. State, Spies v. State, Boone v. State, Christopher and Klimp v. State,* all *supra.* The jury was not required to believe the Appellant or his alibi. *Rasnick v. State,* 7 Md. App. 564, 568 (1969), *Cleveland v. State,* 8 Md. App. 204, 209 (1969), *Tillery v. State,* 3 Md. App. 142, 148 (1967).

Appellant next argues that although he had moved to exclude all witnesses from the courtroom until called to testify, that Robinson, who had completed his testimony, was returned to the courtroom while Ashe was testifying in order for Ashe to identify Robinson. The dialogue pertaining to the identification as disclosed by the transcript is as follows:

"Q. Have you seen a fellow known as Rainbow Robinson [2] since you have been in Salisbury?

A. Yes, I have.

Q. And where did you see him?

A. In the—to the library of the court house.

MR. NEAL: Is Mr. Robinson back there in the witness room?

THE SHERIFF: You want him in?

MR. NEAL: Yes. I would like him brought into the courtroom.

\* \* \*

MR. NEAL: Walk over here. Stand at the point of the table.

BY MR. NEAL:

Q. Do you recognize this man?

MR. CANNIZZARO: Objection, your Honor, sequestered witness. I object to any question be-

---

2. "Rainbow Robinson" is an alias for the accomplice, Robert Lee Robinson.

> ing asked while one of the witnesses is in the courtroom. He is sequestered witness.
>
> THE COURT: I do think — if he wants to ask the witness if he can recognize him, I think he can do that.
>
> MR. NEAL: I'd like to say I am not going to ask Mr. Ashe about any facts of this case in the presence of this witness.
>
> THE COURT: Proceed.
>
> MR. NEAL: I just want to know whether or not he knows him.
>
> BY MR. NEAL:
>
> Q. Have you ever seen this man before?
>
> A. Yes.
>
> Q. Do you know him?
>
> A. Yes, very well.
>
> Q. What's his name?
>
> A. His name is Rainbow Robinson.
>
> MR. NEAL: You may go back to the room. I would like the record to show Mr. Robinson is no longer in the courtroom."

The rule governing the exclusion of witnesses from the court is Rule 753, which provides in part:

> "The court may upon its own motion and shall, upon the request of a party, order that the witnesses be excluded from the courtroom until called upon to testify.  * * *."

The purpose of Rule 753 is to prevent a witness from being taught, schooled or prompted by the testimony of another and to prevent prejudice. *Burton v. State Roads Commission,* 251 Md. 403, 247 A. 2d 718 (1968), *Watts v. State,* 3 Md. App. 454, 240 A. 2d 317 (1968), *Scott v. Warden, Maryland Penitentiary,* 6 Md. App. 200, 251

A. 2d 17 (1969), *Hurley v. State,* 6 Md. App. 348, 251 A. 2d 241 (1969), *Hill v. State,* 9 Md. App. 65, 262 A. 2d 573 (1970).

When the request for exclusion of witnesses is made, it is mandatory that the trial court comply with the request. See *Bulluck v. State,* 219 Md. 67, 148 A. 2d 433 (1959), *Jones v. State,* 4 Md. App. 616, 622, 244 A. 2d 459 (1968).

A similar situation to the instant case developed in *Gunn v. State,* 4 Md. App. 379, 383, 243 A. 2d 15 (1968). In that case the witnesses had been sequestered and a prosecuting witness who had completed her testimony was brought into the courtroom for the purpose of having the doctor who was then testifying identify her as the individual he had examined the night of the rape. We held that notwithstanding the prosecuting witnesses hearing the doctor testify as to his qualification, his examination of the prosecuting witness on the night of the crime and his assumption that she was the young lady he examined, that the error was harmless in view of the fact that the prosecuting witness had completed her testimony.

Here, Robinson had completed his testimony and did not hear any questions put to Ashe. The motion for a mistrial was properly denied.

We turn now to the Appellant's second and fifth questions which are so closely related that we shall treat them as one.

During the testimony of Sgt. Christian, he related to the court that at the time he arrested Appellant on a warrant[3] Pinkney was clothed in shorts and tee shirt. He says he informed Pinkney of his rights under *Miranda.* He then said that he observed that Mr. Pinkney was limping and that, "As my investigation revealed certain facts relative to Mr. Pinkney, I asked Mr. Pink-

---

3. The warrant was signed on Sept. 13, 1968 by Judge Aaron Baer of the Municipal Court of Baltimore City but was not executed until May 1, 1969 because the police were unable to locate Appellant.

ney if he would drop his underclothes and let me take a look and he agreed. He dropped his underclothes and I observed what appeared to be a bullet hole in his right buttocks, right side. I questioned Mr. Pinkney relative to this. He stated 'that was foreign matter and let it go at that.' "

The above testimony was taken out of the presence of the jury. Defense counsel requested permission to put the Appellant on the stand on the *sole* question of the voluntariness of the search of his person.[4] After some colloquy between the court and counsel, the following transpired:

"THE COURT: I will let you go ahead with testimony under the circumstances before the jury.

MR. CANNIZZARO: Before the jury? Couldn't you permit me to put the defendant on the stand to deny, accepting everything the Sergeant said as true without —

THE COURT: I assume the defendant would deny it.

MR. CANNIZZARO: Assume denial?

THE COURT: I am accepting the Sergeant's testimony.

MR. CANNIZZARO: Keep the jury here?

THE COURT: Sure. Put your man on for this purpose.

MR. NEAL: In making this, you're assuming that the defendant is telling the truth, that he is denying that it was with permission?

THE COURT: Assuming it was a denial by the defendant of all the Sergeant said.

---

4. Rule 725, Maryland Rules of Procedure.

MR. NEAL: That he is telling the truth is a jury question?

THE COURT: I believe a right to go to the jury, incident to the jury."

Whereupon, the jury was recalled and the testimony of Sgt. Christian as to the arrest and search was received into evidence.

Appellant likens the court's refusal to take testimony concerning the search of his person to the admission of a confession, and constituting a violation of the Appellant's constitutional rights.

Maryland has long held it elementary that the arresting officer may conduct a search of the person apprehended. *Farrow v. State,* 233 Md. 526 (1963). In *United States v. Rabinowitz,* 339 U. S. 56 (1950), the Supreme Court held:

> "What is a reasonable search is not to be determined by any fixed formula. The Constitution does not define what are 'unreasonable' searches and, regrettably, in our discipline we have no ready litmus-paper test. The recurring questions of the reasonableness of searches must find resolution in the facts and circumstances of each case."

This court has held in *Scott v. State,* 7 Md. App. 505 (1969):

> "The police have the right to conduct a contemporaneous search of the arrestee's person for weapons, fruits or instrumentalities of the crime or, 'mere evidence,' incident to a lawful arrest."

See also *Terry v. State of Ohio,* 392 U. S. 1 (1968), *Gross v. State,* 235 Md. 429, 440 (1964), and *Warden, Maryland Penitentiary v. Hayden,* 387 U. S. 294 (1967).

The Supreme Court said in *Harris v. United States,* 331 U. S. 145 (1947):

"This court has also pointed out that it is only unreasonable searches and seizures which come within the constitutional interdict. The test of reasonableness cannot be stated in rigid and absolute terms. 'Each case is to be decided on its own facts and circumstances.' *Go-Bart Importing Company v. U. S.*, 282 U. S. 344, 357, 75 L. Ed. 374, 382, 51 S. Ct. 153 (1931).

The Fourth Amendment has never been held to require that every valid search and seizure be effected under the authority of a search warrant. Search and seizure incident to a lawful arrest is a practice of ancient origin and has long been an integral part of the law-enforcement procedures of the United States and of the individual states."

The knowledge possessed by the arresting officer that Pinkney had been shot in the buttocks, Pinkney's apparent limp, and the possibility that Appellant could mutilate the wound or scar so as to preclude its later identification as a gunshot wound, or the possibility that the lapse of time between the Appellant's apprehension and actual trial would be such that the wound would heal to the extent that it would be unrecognizable as a gunshot wound, we think justified the *sight seizure* of the evidence.[5]

Since we hold that the search of Pinkney at the time of his arrest was lawful and that none of his constitutional rights were violated thereby, we cannot find that the trial judge's declination to hear Pinkney's denial of permission to search his person was reversible error.

As it develops, the trial judge was correct in not hearing from the Appellant out of the presence of the jury

---

5. Some other reasons for the search could be: (1) In order to make positive identification that the person arrested was Pinkney in view of the fact that the investigation disclosed Pinkney to have been shot in the buttocks, and (2) to ascertain whether the arrestee was in need of medical care for the wound.

on the question of the "search," but for the wrong reason. The better practice for the trial judge to have followed would have been to adhere to Rule 725.

The Appellant was not denied a fair and impartial trial.

*Judgment affirmed.*